**Opinion issued April 7, 2016**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-15-00886-CV

————————————

## IN THE INTEREST OF B.J., JR., B.J., D.L., AND D.L., CHILDREN

On Appeal from the 314th District Court
Harris County, Texas
Trial Court Case No. 2014-05824J

## MEMORANDUM OPINION

In this accelerated appeal,[1] appellant, T.T., challenges the trial court's order, entered after a bench trial, terminating her parental rights to four of her minor

---

[1] *See* TEX. FAM. CODE ANN. § 263.405(a) (Vernon 2014); TEX. R. APP. P. 28.4. Although the trial court also terminated the parental rights of the fathers of the four children, they are not parties to this appeal.

children, B.J., Jr., B.J., D.L., and D.B.L. (collectively, the "four children").[2] In three issues, T.T. contends that the evidence is legally and factually insufficient to support the trial court's findings that she engaged in conduct, or knowingly placed the four children with persons who engaged in conduct, that endangered their physical and emotional well-being,[3] she failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of the four children,[4] and termination of her parental rights was in the best interest of the four children.[5]

We affirm.

## Background

On November 10, 2014, the Texas Department of Family and Protective Services ("DFPS") filed a petition seeking managing conservatorship of the four children and termination of T.T.'s parental rights to them. By affidavit attached to the petition, DFPS Investigator Jonathan Beauford testified[6] that on October 6, 2014,

---

[2]    Our style of the case is in accord with the trial court's Decree for Termination. *See Brown v. Bank of Am., N.A.*, No. 01-14-00725-CV, 2015 WL 4760201, at *1 n.1 (Tex. App.—Houston [1st Dist.] Aug. 13, 2015, no pet.) (mem. op.); *Strobel v. Marlow*, 341 S.W.3d 470, 471 n.1 (Tex. App.—Dallas 2011, no pet.). However, for clarity purposes, in this opinion, we will refer to the four children as B.J., Jr., B.J., D.L., and D.B.L.

[3]    *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E) (Vernon Supp. 2015).

[4]    *See id.* § 161.001(b)(1)(O).

[5]    *See id.* § 161.001(b)(2).

[6]    At trial, the trial court admitted Beauford's affidavit into evidence.

DFPS received a report that T.T., who lived with the four children and D.T., T.T.'s second oldest child and a "runaway" who is not a subject of this case, repeatedly "beat[]" D.T. "with whatever she c[ould] get her hands on." D.T. had "scars and old marks from the times [that T.T.] has hit him," and the family had been previously "kicked out of several places" where they had been living because of T.T.'s repeated beating of D.T. DFPS also alleged that T.T. did not provide a "stable home" and the children were "bounce[d] around from home to home."

DFPS further alleged that T.T. "snort[ed] cocaine, smoke[d] marijuana, t[ook] pills, and dr[a]nk[] a lot." She used narcotics "around the [four] children" and took them to places where "adults . . . use[d] drugs." T.T. also left D.T. to watch the four children while "she r[an] the streets." And she had previously left the children with only "noodles to eat" or "without any food for the day." Further, T.T. did not spend on the four children any money that she received from "disability checks" for them.

At trial, former DFPS caseworker Nishikie Gladney testified that the four children[7] came into DFPS's care due to allegations of "physical abuse and neglectful supervision" related to T.T.'s narcotics use. Gladney also noted that although T.T. received a family service plan, she did not "perform all of her services." T.T. failed to "establish legal employment," did not provide "a lease agreement for where she's

---

[7] At the time of trial, B.J., Jr. was eight years old, B.J. was seven years old, D.L. was four years old, and D.B.L. was two years old.

living," and continuously "test[ed] positive throughout the case for narcotics [use]." Gladney explained that, while the case was pending, T.T. tested positive for narcotics use numerous times between November 5, 2014 and August 25, 2015.[8]

In regard to the fathers of the four children, Gladney noted that the father of B.J., Jr. and B.J. was "currently incarcerated," serving a sentence of "15 years [in] TDCJ" "on a burglary charge." And the father of D.L. and D.B.L. was "currently incarcerated" as well, "serving three years [in] TDCJ" for the offense of "possession of a controlled substance."[9] Also, the father of D.L. and D.B.L. tested positive for narcotics use during the pendency of the case.[10]

Gladney further testified that it was in the best interest of the four children for the court to terminate T.T.'s parental rights because she tested positive for narcotics use throughout the pendency of the case, had not "provided a safe or stable home . . . for the[] children," and had not secured employment. Also, T.T. has a

---

[8] The trial court admitted into evidence T.T.'s narcotics-test results, revealing that she tested positive for cocaine and marijuana use on October 31, 2014; cocaine, marijuana, and alcohol use on December 2, 2014; cocaine and marijuana use on December 29, 2014; cocaine, marijuana, and alcohol use on January 15, 2015; cocaine, marijuana, and alcohol use on March 5, 2015; and cocaine use on August 25, 2015. We note that the record contains additional narcotics-test results, also admitted into evidence, which are illegible.

[9] The trial court admitted additional evidence of the criminal records of the fathers.

[10] The trial court admitted into evidence the narcotics-test results of the father of D.L. and D.B.L.

criminal record, which includes several convictions for the offenses of prostitution, theft, and attempted impersonation of a public servant.[11]

Further, when the four children came into DFPS's care, B.J., Jr. and B.J. were "severely delayed," both "developmentally and scholastically," and B.J. was in the "bottom two percent" of her class. D.L. and D.B.L. had "speech problems," and Gladney explained that she "could barely understand anything" they said. D.B.L.

---

[11] The trial court admitted evidence of T.T.'s criminal record, revealing that on January 16, 1996, she was convicted of the misdemeanor offense of prostitution and sentenced to confinement for ninety days; on May 29, 1996, she was convicted of the misdemeanor offense of theft and sentenced to confinement for 130 days; on September 30, 1996, she was convicted of the misdemeanor offense of prostitution and sentenced to confinement for 125 days; on November 12, 1998, she was convicted of the misdemeanor offense of prostitution and sentenced to confinement for ninety-five days; on April 25, 2002, she was convicted of the felony offense of prostitution and sentenced to confinement for six months; on April 26, 2002, she was convicted of the felony offense of attempted impersonation of a public servant and sentenced to confinement for six months; on January 15, 2004, she was convicted of the felony offense of theft and sentenced to confinement for two years; and on May 4, 2011, she was convicted of the misdemeanor offense of theft and sentenced to confinement for sixty days.

Beauford, in his affidavit, also testified that on December 20, 1991, T.T. was convicted of the felony offense of possession of cocaine and sentenced to confinement for four years; on December 20, 1991, T.T. was convicted of the felony offense of possession of a controlled substance and was sentenced to confinement for four years; on September 30, 1992, T.T. was convicted of the misdemeanor offense of prostitution and was sentenced to confinement for thirty days; on August 26, 1994, T.T. was convicted of the misdemeanor offense of prostitution and sentenced to confinement for sixty days; on October 9, 1995, T.T. was convicted of the misdemeanor offense of prostitution and sentenced to confinement for ninety days; on March 27, 1997, T.T. was convicted of the felony offense of possession of a controlled substance and sentenced to confinement for 120 days; on June 3, 1997, T.T. was convicted of the felony offense of possession of a controlled substance and sentenced to confinement for three years; and on January 13, 2004, T.T. was convicted of the felony offense of theft and sentenced to confinement for two years.

5

had also been "medically neglected" and required "tubes . . . in her ears because she had [a] severe ear infection . . . from no one taking her to the doctor." According to Gladney, T.T. never "demonstrated that [she] c[ould] provide a safe and stable home for the[] children," never "supported the[] children," and was not currently "in a position . . . to provide [for] or support . . . the[] children." Thus, Gladney opined that it was in the best interest of the four children for the court to terminate T.T.'s parental rights and "allow the[] children to remain in their current placements."

Gladney further testified that the four children were currently placed in two separate foster homes, with B.J., Jr. and B.J. "placed together" and D.L. and D.B.L. "placed together." The foster home in which B.J., Jr. and B.J. were placed had the potential for adoption, while D.L. and D.B.L.'s paternal grandmother was "willing to take" them. According to Gladney, the four children's current respective placements were meeting all of their physical and emotional needs, and they were "doing pretty good" in their placements. Notably, the four children had "improved dramatically" in regard to schooling and were reading at a higher level.

Bruce Jefferies, an expert in interpreting narcotics test results, testified that T.T.'s repeated positive test results for cocaine use indicated that she was "[s]till using" cocaine and had "used [cocaine] more than once" since November 2014. Thus, it was "undisput[able]" that T.T. and the father of D.L. and D.B.L. had "used drugs during the pendency of th[e] case."

The trial court admitted into evidence a Child Advocates, Inc. "Court Report," which contains the recommendation of Child Advocates that the four children "remain in their current placement[s]" and "all parental rights" be terminated. In regard to T.T., the Court Report notes that she "completed her psychiatric evaluation"; "completed outpatient substance abuse treatment, parenting classes, and anger management classes"; "started to attend a 12-step program"; and "participat[ed] in individual therapy." However, T.T. remained unemployed and did not secure "stable housing." T.T. also tested positive for narcotics use on October 31, 2014, December 29, 2014, March 19, 2015, April 2, 2015, April 16, 2015, May 8, 2015, June 23, 2015, and August 25, 2015.[12]

In regard to the four children, the Court Report states that it was in their best interest that "all parental rights [be] terminated." As per the report, when D.L. and D.B.L. came into DFPS's care, they "were not talking" and only communicated non-verbally, by "point[ing] to what they wanted." Further, the "only words" that D.L. and D.B.L. spoke "clearly" were "the 'N' word and the 'B' word." D.L. and D.B.L. also required medical attention, and they fought with each other and with the children of their foster mother. Moreover, D.L. needed glasses because her "right

---

[12] The Court Report also notes that T.T.'s urinalyses were "negative" on certain occasions. According to the report, T.T.'s last positive urinalysis was on March 19, 2015 "for [m]arijuana" use. T.T.'s narcotics testing utilized "hair follicles" and urinalysis.

eye was not centered and it was in the corner toward her nose." D.B.L. required "minor surgery" to insert "drainage tubes" into her ears. And D.L. and D.B.L. both attended speech therapy and play therapy.

In regard to B.J., Jr. and B.J., the Court Report notes that their reading level at the time they came into DFPS's care was "below their age group." Attendance records from their prior school showed that B.J., Jr. had been absent from school for thirty days and B.J. had been absent from school for twenty-seven days. Because of their "lack of school attendance," the school was unable to "provide a grade" for either child. B.J. also reportedly fought with other girls during class, was "very disruptive," and "stole things" from other children. B.J., Jr. was reportedly "withdrawn and sad" and took "things that did not belong to him." As per the Court Report, B.J., Jr. and B.J. were under the care of a child-adolescent physiatrist and required medication for Attention Hyperactivity Deficit Disorder ("ADHD"), Oppositional Defiant Disorder ("ODD"), and bedwetting.

The Children's Crisis Care Center "Family Evaluation," which the trial court admitted into evidence, provides details of T.T.'s history, including that "she began prostituting and using drugs" when she was eighteen years old.[13] She entered a rehabilitation program after the birth of her first child, who is not a subject of this case, because "she tested positive for substances at [his] birth." T.T. did not

---

[13] T.T. was forty-two years old at the time the Family Evaluation was completed.

successfully complete the program. The Family Evaluation also notes that T.T. ended her relationship with D.T's father after she became pregnant because he was "a heavy substance user, and was violent and abusive towards her."

In regard to the father of B.J., Jr. and B.J., with whom T.T. had previously lived, the Family Evaluation states that T.T. "knew that [he] had a PCP addiction at the time that [she] began a relationship" with him. However, according to T.T., he never used narcotics "around her [or] the children," although he "smell[ed]" of PCP when he would return to their home. The father of B.J., Jr. and B.J. also "rob[bed] people" and "went to jail [after] their home was raided by law enforcement." According to T.T., she "was not arrested" partly because "she had children in the home."

After the father of B.J., Jr. and B.J. was imprisoned, T.T. "began a relationship" with the father of D.L. and D.B.L., who "was a [known] drug dealer in her neighborhood that she had 'watched' for several months" before she approached him "about a relationship." T.T. and the father of D.L. and D.B.L. began dating in October 2008, and "he moved into the home with her and the children a few weeks" later. The Family Evaluation notes that, according to T.T., the father of D.L. and D.B.L. "stopped selling drugs" and began "working full time to support her and the children." However, he "returned to selling drugs" because "she was not doing well financially."

The Family Evaluation further notes that T.T. had "a long history of substance abuse," "life instability," and "dysfunctional behavior as an adult." Although T.T. did not deny "the allegations of substance abuse," she did "minimize[]" the impact that her substance abuse had on the four children. T.T. and the father of D.L. and D.B.L. were "regularly" under the influence of "several . . . highly addictive substances while parenting the[] children." And the father of D.L. and D.B.L. "exposed the children" "to an unsafe environment" and "to [the] dangers of his criminal activity regarding selling drugs." The Family Evaluation also explains that the four children, while in the care of T.T., had "untreated medical and physical conditions" and "the[ir] home environment was chaotic and unsafe." Further, the substance abuse of T.T. and the father of D.L. and D.B.L. "present[ed] a danger to the[] children, some of whom ha[d] special needs and others who [were] very young and completely dependent upon their parents for care." When T.T. and the father of D.L. and D.B.L.'s were "[u]nder the influence," they had "impaired judgment and decision making that put[] the children at risk." The Family Evaluation also expresses "concern" that because neither T.T. nor the father of D.L. and D.B.L. had a "verifiable income," the children would be exposed to a "risk of danger due to . . . continued drug selling."

T.T. testified that she was "self employed" as a fingernail technician and "cook[ed] food and . . . host[ed] parties for children." However, she admitted that

she had "never provided a paycheck stub to CPS." T.T. explained that she found an apartment, which she would be moving into on October 1, 2015. However, she noted that she did not provide DFPS with a copy of a lease agreement.

T.T. stated that B.J., Jr. and B.J. did not have "trouble in school." However, she admitted that D.L. and D.B.L. had "speech problems," and she had taken them to the doctor and they had "started" speech therapy. According to T.T., she was "diligent in doctor's visits" and "in getting [the four] children to school." And she noted that she had signed her family service plan.

In regard to her use of narcotics, T.T. denied using cocaine, but admitted to using marijuana in February 2015 during the pendency of this case. She explained that she tested positive for cocaine use because the father of D.L. and D.B.L. sold narcotics and he "kept large[] amounts of drugs in his mouth." According to T.T., he exposed her to cocaine "through sexual contact." T.T. admitted that the father of D.L. and D.B.L. was a "drug dealer" and she had known that he was selling narcotics since 2009. However, according to T.T., he had "stopped . . . dealing drugs and got a job," but subsequently "relapsed" around the time this case was filed.

**Standard of Review**

A parent's right to "the companionship, care, custody, and management" of her children is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982) (internal

11

quotations omitted). The United States Supreme Court has emphasized that "the interest of parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 2060 (2000). Likewise, the Texas Supreme Court has concluded that "[t]his natural parental right" is "essential," "a basic civil right of man," and "far more precious than property rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (internal quotations omitted). Consequently, "[w]e strictly construe involuntary termination statutes in favor of the parent." *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012).

Because termination of parental rights "is complete, final, irrevocable and divests for all time that natural right . . . , the evidence in support of termination must be clear and convincing before a court may involuntarily terminate a parent's rights." *Holick*, 685 S.W.2d at 20. Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (Vernon 2014); *see also In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). Because the standard of proof is "clear and convincing evidence," the Texas Supreme Court has held that the traditional legal and factual standards of review are inadequate. *In re J.F.C.*, 96 S.W.3d at 264–68.

In conducting a legal-sufficiency review in a termination-of-parental-rights case, we must determine whether the evidence, viewed in the light most favorable to the finding, is such that the fact finder could reasonably have formed a firm belief or conviction about the truth of the matter on which DFPS bore the burden of proof. *Id.* In viewing the evidence in the light most favorable to the finding, we "must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so," and we "should disregard all evidence that a reasonable factfinder could have disbelieved or found to be incredible." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (internal quotations omitted). However, this does not mean that we must disregard all evidence that does not support the finding. *In re J.F.C.*, 96 S.W.3d at 266. Because of the heightened standard, we must also be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.* If we determine that no reasonable trier of fact could form a firm belief or conviction that the matter that must be proven is true, we must hold the evidence to be legally insufficient and render judgment in favor of the parent. *Id.*

In conducting a factual-sufficiency review in a parental-rights termination case, we must determine whether, considering the entire record, including evidence both supporting and contradicting the finding, a fact finder reasonably could have formed a firm conviction or belief about the truth of the matter on which DFPS bore

the burden of proof. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). We should consider whether the disputed evidence is such that a reasonable fact finder could not have resolved the disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266–67. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (internal quotations omitted).

## Sufficiency of the Evidence

In three issues, T.T. argues that the trial court erred in terminating her parental rights to the four children because the evidence is legally and factually insufficient to support the trial court's findings that she engaged in conduct, or knowingly placed the children with persons who engaged in conduct, that endangered their physical and emotional well-being, she failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of the children, and termination of her parental rights was in the best interest of the children. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E), (O), (b)(2) (Vernon Supp. 2015).

In order to terminate the parent-child relationship, DFPS must establish, by clear and convincing evidence, one or more of the acts or omissions enumerated

under Texas Family Code section 161.001(b)(1) and that termination is in the best interest of the children. *See id.* § 161.001(b). Both elements must be established, and termination may not be based solely on the best interest of the children as determined by the trier of fact. *Id.*; *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). Notably though, "[o]nly one predicate finding under section 161.001[(b)](1) is necessary to support a judgment of termination when there is also a finding that termination is in the child[ren]'s best interest." *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

### *Endangering Conduct*

In her first issue, T.T. argues that the evidence is legally and factually insufficient to support termination of her parental rights to the four children under section 161.001(b)(1)(E) because she "rarely engaged in conduct that endangered" their physical and emotional well-being, "denied using cocaine," and her "present conduct proves [she] seeks to improve" the well-being of the children.

A trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has "engaged in conduct or knowingly placed the child[ren] with persons who engaged in conduct which endangers the physical or emotional well-being of the child[ren]." TEX. FAM. CODE ANN. § 161.001(b)(1)(E). Within the context of subsection E, endangerment encompasses "more than a threat of metaphysical injury or the possible ill effects of

15

a less-than-ideal family environment." *Boyd*, 727 S.W.2d at 533. Instead, "endanger" means to expose the children to loss or injury or to jeopardize their emotional or physical health. *Id.*; *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 616–17 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

It is not necessary to establish that a parent intended to endanger the children in order to support termination of the parent-child relationship. *See In re M.C.*, 917 S.W.2d 268, 270 (Tex. 1996) (neglect, even in absence of physical abuse, may endanger children's physical or emotional well-being). However, termination under subsection E requires "more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required." *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.); *see also In re J.W.*, 152 S.W.3d 200, 205 (Tex. App.—Dallas 2004, pet. denied). The specific danger to the children's well-being may be inferred from parental misconduct standing alone, even if the conduct is not directed at the children and they suffer no actual injury. *See Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied). And courts may consider parental conduct that did not occur in the children's presence, including conduct before the children's birth and after they have been removed by DFPS. *In re A.A.M.*, 464 S.W.3d 421, 426 (Tex. App.—Houston [1st Dist.] 2015, no pet.); *Walker*, 312 S.W.3d at 617.

16

Here, the evidence shows that T.T. "began prostituting and using drugs" when she was eighteen years old. Although she entered a rehabilitation program after she had "tested positive for substances" at the birth of her oldest child, she did not successfully complete the program. Further, Gladney testified that during the pendency of this case, T.T. tested positive for narcotics use on numerous occasions. And T.T.'s narcotics-test results show that she tested positive for narcotics use on October 31, 2014, December 2, 2014, December 29, 2014, January 15, 2015, March 5, 2015, and August 25, 2015. Also, the Child Advocates Court Report notes that T.T. also tested positive for narcotics use on March 19, 2015, April 2, 2015, April 16, 2015, May 8, 2015, and June 23, 2015. According to Jefferies, it is "undisput[able]" that T.T. "used drugs during the pendency of th[e] case" and numerous positive test results indicate that she was "[s]till using" cocaine. Moreover, T.T. admitted to using marijuana in February 2015, while this case was pending. And the trial court could have reasonably rejected her explanation that she tested positive for cocaine use because the father of D.L. and D.B.L. sold narcotics, "kept large[] amounts of drugs in his mouth," and exposed her to cocaine "through sexual contact."

The Children's Crisis Care Center Family Evaluation notes that T.T. did not deny "the allegations of substance abuse." Instead, she "minimized the impact" that it had on the four children. The Family Evaluation also states that T.T. was

"regularly" under the influence of "several . . . highly addictive substances while parenting the[] children." Her "substance abuse [issues] present[ed] a danger to the[] children, some of whom ha[d] special needs and others who [were] very young and completely dependent upon their parents for care." And when T.T. is "[u]nder the influence," she has "impaired judgment and decision making that puts the children at risk."

The evidence also reveals that T.T. has a history of involvement with individuals who use and sell narcotics. The Family Evaluation states that the fathers of T.T.'s two oldest children, who are not subjects of this case, had "drug addiction issues" and were "heavy substance user[s]." D.T.'s father was "violent and abusive" towards T.T. And when T.T. became involved with the father of B.J., Jr. and B.J., she knew that he "had a PCP addiction" and "she could smell the substance on him when he would return to the home" they shared with T.T.'s children.

T.T. also knew that the father of D.L. and D.B.L., with whom she lived with the four children, was a "drug dealer in her neighborhood" before she began a relationship with him. And the Family Evaluation notes that, according to T.T., although the father of D.L. and D.B.L. "stopped selling drugs" and was "working full time to support her and the children" for a period of time, he subsequently "returned to selling drugs" because "she was not doing well financially." The Family Evaluation also states that the father of D.L. and D.B.L. had "an extensive

history of substance abuse and criminal history related to selling drugs" and "exposed the children to [the] dangers of his criminal activity." He "regularly" parented the four children while under the influence of "several . . . highly addictive substances" and exposed them to a "risk of danger due to [his] continued drug selling."

T.T. admitted that the father of D.L. and D.B.L. was a "drug dealer" and she had known that he had sold narcotics since 2009. Although T.T. testified that the father of D.L. and D.B.L. had "stopped . . . dealing drugs and got a job," she testified that he had "relapsed" around the time that the case was filed.

"As a general rule, conduct that subjects . . . child[ren] to a life of uncertainty and instability endangers the physical and emotional well-being of [the] child[ren]." *In re R.W.*, 129 S.W.3d at 739. Further, illegal narcotics use and its effect on an individual's ability to parent may constitute an endangering course of conduct. *In re J.O.A.*, 283 S.W.3d 336, 345–46 (Tex. 2009); *In re A.A.M.*, 464 S.W.3d at 426–27. Illegal narcotics use creates the possibility that a parent will be impaired or imprisoned, and thus, incapable of parenting, supporting termination of parental rights under subsection E. *In re A.A.M.*, 464 S.W.3d at 426; *Walker*, 312 S.W.3d at 617–18; *see also In re M.R.R.*, No. 10-15-00303-CV, 2016 WL 192583, at *5 (Tex. App.—Waco Jan. 14, 2016, no pet.) (mem. op.) ("A parent's continued drug use

demonstrates an inability to provide for the child's emotional and physical needs and to provide a stable environment for the child.").

The trial court could have reasonably found that T.T.'s continued narcotics use, long history of involvement with individuals who also used narcotics, and decision to be in a relationship with, and live with, the father of D.L. and D.B.L., a known "drug dealer," while she cared for the four children, qualified as a continuing course of conduct that subjected them to a life of uncertainty and instability, endangering their physical and emotional well-being. *See In re A.A.M.*, 464 S.W.3d at 426–27 ("[T]he trial court reasonably could have concluded that the [parent's] continued pattern of drug use, even after [DFPS]'s involvement, displayed a voluntary, deliberate, continued, and conscious course of endangering conduct . . . ."); *Walker*, 312 S.W.3d at 617–18 ("Evidence of narcotics use and its effect on a parent's life and ability to parent may establish that the parent has engaged in an endangering course of conduct."); *see also In re T.G.R.-M.*, 404 S.W.3d 7, 13–16 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (mother's association with child's father, "a man who acknowledged his engagement in criminal activity," pertinent to endangerment finding).

Additionally, "evidence of criminal conduct, convictions, or imprisonment is relevant to a review of whether a parent engaged in a course of conduct that endangered the well-being of the child[ren]." *In re S.R.*, 452 S.W.3d 351, 360–61

20

(Tex. App.—Houston [14th Dist.] 2014, pet. denied); *see also In re A.A.M.*, 464 S.W.3d at 426–27 (criminal offenses "significantly harm the parenting relationship" and "can constitute endangerment even if the criminal conduct transpires outside the child's presence"). Although incarceration alone will not support termination of parental rights, evidence of criminal conduct, convictions, and imprisonment may support a finding of endangerment under subsection E. *In re T.M.*, No. 14-14-00948-CV, 2015 WL 1778949, at *4 (Tex. App.—Houston [14th Dist.] Apr. 16, 2015, no pet.) (mem. op.); *see also In re A.A.M.*, 464 S.W.3d at 426–27 (recognizing parent's imprisonment demonstrated deliberate course of conduct qualifying as endangering conduct). If the imprisonment of the parent reflects a voluntary, deliberate, and conscious course of conduct, it qualifies as conduct that endangers the child. *See Walker*, 312 S.W.3d at 617.

The record here reflects that on December 20, 1991, T.T. was convicted of the felony offense of possession of cocaine and sentenced to confinement for four years; on December 20, 1991, T.T. was convicted of the felony offense of possession of a controlled substance and sentenced to confinement for four years; on September 30, 1992, T.T. was convicted of the misdemeanor offense of prostitution and sentenced to confinement for thirty days; on August 26, 1994, T.T. was convicted of the misdemeanor offense of prostitution and sentenced to confinement for sixty days; on October 9, 1995, T.T was convicted of the misdemeanor offense of prostitution

and sentenced to confinement for ninety days; on January 16, 1996, T.T. was convicted of the misdemeanor offense of prostitution and sentenced to confinement for ninety days; on May 29, 1996, T.T. was convicted of the misdemeanor offense of theft and sentenced to confinement for 130 days; on September 30, 1996, T.T. was convicted of the misdemeanor offense of prostitution and sentenced to confinement for 125 days; on March 27, 1997, T.T. was convicted of the felony offense of possession of a controlled substance and sentenced to confinement for 120 days; on June 3, 1997, T.T. was convicted of the felony offense of possession of a controlled substance and sentenced to confinement for three years; on November 12, 1998, T.T. was convicted of the misdemeanor offense of prostitution and sentenced to confinement for ninety-five days; on April 25, 2002, T.T. was convicted of the felony offense of prostitution and sentenced to confinement for six months; on April 26, 2002, T.T was convicted of the felony offense of attempted impersonation of a public servant and sentenced to confinement for six months; on January 13, 2004, T.T was convicted of the felony offense of theft and sentenced to confinement for two years; on January 15, 2004, T.T. was convicted of the felony offense of theft and sentenced to confinement for two years; and on May 4, 2011, T.T. was convicted of the misdemeanor offense of theft and sentenced to confinement for sixty days.

Although most of T.T.'s convictions and terms of imprisonment occurred prior to the births of the four children, "courts look to what [a] parent did both before and after the child[ren]'s birth[s] to determine whether termination [of parental rights] is necessary." *In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.); *see also Walker*, 312 S.W.3d at 617 (offenses occurring before child born still considered "as part of a voluntary, deliberate, and conscious course of conduct" having effect of endangering child). And conduct that routinely subjects children to the probability that they will be left alone because a parent is jailed endangers both the physical and emotional well-being of the children. *Walker*, 312 S.W.3d at 617; *see also In re T.G.R.-M.*, 404 S.W.3d. at 14–15 ("each time" parent "jailed," "she was absent from [child's] life and was not able to provide for [child's] physical and emotional needs"). Further, courts have recognized that narcotics use and the imprisonment relating to it harm the physical and emotional well-being of the children as well as the parent-child relationship. *See In re A.A.M.*, 464 S.W.3d at 426–27.

Since 1991, T.T. has been convicted of sixteen different criminal offenses. Thus, she, on average, has been convicted of a criminal offense approximately once every seventeen months for the past twenty-four years. *Cf. Medellin v. Tex. Dep't of Family & Protective Servs.*, No. 03-11-00558-CV, 2012 WL 4466511, at *7 (Tex. App.—Austin Sept. 26, 2012, pet. denied) (mem. op.) (parent's "criminal history as

a whole show[ed] that, for nearly twenty years, [he] ha[d] been convicted of a criminal offense once every two years, on average"). Although not all of T.T.'s convictions were for serious offenses, the series of convictions, taken in connection with her narcotics use, are relevant to whether T.T. engaged in a course of conduct that endangered the physical and emotional well-being of the four children.

T.T. argues that the evidence is legally and factually insufficient to support the trial court's finding that she engaged in conduct, or knowingly placed the four children with persons who engaged in conduct, that endangered their physical and emotional well-being, because she "denied using cocaine," "testified that cocaine . . . show[ed] up in her hair due to sexual conduct" with the father of D.L. and D.B.L., "testified [that] she [was] not ingesting cocaine," and her self-employment and securing of an apartment "prove[]" that she "seeks to improve the well being of her children."

However, the trial court, as the fact finder, was not required to believe T.T.'s testimony regarding her lack of cocaine use, her employment status, or her living arrangements. *See In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014). Further, even assuming that the trial court believed T.T.'s testimony that she was "self employed" as a fingernail technician, "cook[ed] food and . . . host[ed] parties for children," and had secured an apartment, evidence of improved conduct, especially over only a short duration, does not negate a long history of narcotics use and inappropriate

choices. *See In re J.O.A.*, 283 S.W.3d at 346; *see also In re A.C.*, Nos. 10-15-00192-CV, 10-15-00193-CV, 2015 WL 6437843, at *8 (Tex. App.—Waco Oct. 22, 2015, no pet.) (mem. op.) (evidence legally and factually sufficient to establish termination of parental rights under subsection E and emphasizing "evidence of recent improvement does not absolve [a] parent of a history of irresponsible choices").

Viewing the evidence in the light most favorable to the trial court's finding, we conclude that the trial court could have formed a firm belief or conviction that T.T. engaged in conduct, or knowingly placed the four children with persons who engaged in conduct, that endangered their physical and emotional well-being. And, viewing the evidence in a neutral light, we conclude that a reasonable fact finder could have formed a firm belief or conviction that T.T. engaged in conduct, or knowingly placed the four children with persons who engaged in conduct, that endangered their physical and emotional well-being. *Cf. Walker*, 312 S.W.3d at 616–18.

Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's finding that T.T. engaged in conduct, or knowingly placed the four children with persons who engaged in conduct, that endangered their physical and emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E).

We overrule T.T.'s first issue.[14]

## *Best Interest of Children*

In her third issue, T.T. argues that the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights was in the best interest of the four children because there is evidence in the record that she was "doing a good job at working on her issues" and had not been using narcotics.

In determining whether the termination of T.T.'s parental rights is in the best interest of the four children, we may consider several factors, including: (1) the children's desires; (2) the current and future physical and emotional needs of the children; (3) the current and future emotional and physical danger to the children; (4) the parental abilities of the parties seeking custody; (5) whether programs are available to assist those parties; (6) plans for the children by the parties seeking custody; (7) the stability of the proposed placement; (8) the parent's acts or omissions that may indicate that the parent-child relationship is not proper; and (9) any excuse for the parent's acts or omissions. *See Holley v. Adams*, 544 S.W.2d

---

[14] Having held that the evidence is legally and factually sufficient to support the trial court's finding under section 161.001(b)(1)(E), we need not address T.T.'s second issue challenging the trial court's finding under section 161.001(b)(1)(O). *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 618 (Tex. App.—Houston [1st Dist.] 2009, pet. denied); *see also* TEX. R. APP. P. 47.1.

367, 371–72 (Tex. 1976); *In re L.M.*, 104 S.W.3d 642, 647 (Tex. App.—Houston [1st Dist.] 2003, no pet.). The *Holley* factors are not exhaustive, and there is no requirement that DFPS prove all factors as a condition precedent to the termination of parental rights.[15] *See In re C.H.*, 89 S.W.3d at 27.

In regard to the four children's current and future physical and emotional needs, Gladney testified that T.T. did not demonstrate that she could "provide a safe and stable home" for them, did not "support[]" them, and was not currently in a position to provide for or support them. *See In re K.C.*, 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet.) (child's need for stable, permanent home paramount consideration in best interest determination); *Adams v. Tex. Dep't of Family & Protective Servs.*, 236 S.W.3d 271, 280 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (parent's history of failing to provide children with "stable and nurturing environment" demonstrates termination of parental rights in best interest of children). When the four children came into DFPS's care, B.J., Jr. and B.J. were "severely delayed," both "developmentally and scholastically," and B.J. was in the "bottom two percent" of her class. D.L. and D.B.L. had "speech problems," and Gladney explained that she "could barely understand anything" they said. D.B.L., while in T.T.'s care, had also been "medically neglected" and required "tubes . . . in

---

[15] We note that there is no evidence in the record regarding the children's desires.

her ears because she had [a] severe ear infection . . . from no one taking her to the doctor."

Further, the Child Advocates Court Report states that T.T. was unemployed and did not secure "stable housing." *See In re C.A.J.*, 122 S.W.3d 888, 893–94 (Tex. App.—Fort Worth 2003, no pet.) ("Without stability, income, or a home, appellant is unable to provide for the child's emotional and physical needs."). The report also notes that when D.L. and D.B.L. came into DFPS's care, they "were not talking" and only communicated non-verbally, by "point[ing] to what they wanted." The only words that they spoke "clearly" were "the 'N' word and the 'B' word." D.L. and D.B.L. fought with each other as well as other children. D.L. needed glasses because her "right eye was not centered and . . . was in the corner toward her nose." D.B.L. required "minor surgery" to insert "drainage tubes" into her ears. And both D.L. and D.B.L. needed to attend speech therapy and play therapy.

The Court Report further states that the reading level of B.J., Jr. and B.J. at the time that they entered DFPS's care was "below their age group." Attendance records from their prior school showed that B.J., Jr. had been absent from school for thirty days and B.J. had been absent from school for twenty-seven days. B.J. reportedly fought with other girls during class, was "very disruptive," and "stole things" from other children. B.J., Jr. was reportedly "withdrawn and sad" and took "things that did not belong to him." B.J., Jr. and B.J. were also under the care of a

child-adolescent physiatrist and required medication for ADHD, ODD, and bedwetting.

The Children's Crisis Care Center Family Evaluation also notes that the four children, while in the care of T.T., had "untreated medical and physical conditions" and "the[ir] home environment was chaotic and unsafe." Further, the Family Evaluation raises a concern regarding T.T.'s lack of a "verifiable income." *See Adams*, 236 S.W.3d at 271 (relying on evidence children had "emotional issues" and "it would be in the[ir] . . . best interest to be raised in a consistent, stable, and nurturing environment").

T.T. did testify that she was "self employed" as a fingernail technician and she "cook[ed] food and . . . host[ed] parties for children." However, she admitted that she had "never provided a paycheck stub to CPS." And although T.T. testified that she would be moving into an apartment on October 1, 2015, she admitted that she did not provide DFPS a copy of a lease agreement.

In regard to the current and future emotional and physical danger to the four children, Gladney testified that the children came into DFPS's care due to allegations of "physical abuse and neglectful supervision" related to T.T.'s narcotics use. Gladney explained that T.T. had continuously "test[ed] positive throughout the case for narcotics [use]," testing positive for narcotics use numerous times between November 5, 2014 and August 25, 2015. The results from T.T.'s narcotics testing

29

specifically show that she tested positive for narcotics use on October 31, 2014, December 2, 2014, December 29, 2014, January 15, 2015, March 5, 2015, and August 25, 2015. Further, the Court Report states that she also tested positive for narcotics use on March 19, 2015, April 2, 2015, April 16, 2015, May 8, 2015, and June 23, 2015.

Jefferies opined that T.T.'s repeated positive test results for cocaine use indicated that she was "[s]till using" cocaine and had "used [cocaine] more than once" since November 2014. Thus, it was "undisput[able]" that T.T. had "used drugs during the pendency of th[e] case." T.T. also admitted to using marijuana in February 2015, while this case was pending. And the Family Evaluation states that she had "a long history of substance abuse," "life instability," and "dysfunctional behavior as an adult." And she was "regularly" under the influence of "several . . . highly addictive substances while parenting the[] children," with her substance abuse "presenting a danger to the[] children, some of whom ha[d] special needs and others who [were] very young and completely dependent upon their parents for care." Moreover, the Family Evaluation explains that when T.T. was "[u]nder the influence," she had "impaired judgment and decision making that puts the children at risk." *See In re T.L.S.*, No. 01-12-00434-CV, 2012 WL 6213515, at *6 (Tex. App.—Houston [1st Dist.] Dec. 13, 2012, no pet.) (mem. op.) (considering parent's narcotics use in analyzing "present and future emotional and physical

30

danger to the children"); *In re S.B.*, 207 S.W.3d 877, 886–87 (Tex. App.—Fort Worth 2006, no pet.) (parent's narcotics use considered in determining current and future emotional and physical danger to children).

Gladney further testified that T.T. has a criminal record, which includes several convictions for the offenses of prostitution, theft, and attempted impersonation of a public servant. And, as previously noted, the trial court admitted T.T.'s significant criminal record into evidence. *See In re T.L.S.*, 2012 WL 6213515, at *6 (parent's criminal history considered in determining "present and future emotional and physical danger to the children"); *In re A.M.*, 385 S.W.3d 74, 82 (Tex. App.—Waco 2012, pet. denied) ("[E]vidence of past misconduct or neglect can be used to measure a parent's future conduct.").

In regard to T.T.'s parental ability, Gladney testified that the children came into DFPS's care due to allegations of "physical abuse and neglectful supervision" related to T.T.'s narcotics use. When the four children came into DFPS's care, B.J., Jr. and B.J. were "severely delayed," both "developmentally and scholastically," and B.J. was in the "bottom two percent" of her class. D.L. and D.B.L. had "speech problems," and D.B.L. had been "medically neglected." According to Gladney, D.B.L. required "tubes . . . in her ears because she had [a] severe ear infection . . . from no one taking her to the doctor." Additionally, the Court Report states that when D.L. and D.B.L. came into DFPS's care, they only communicated

31

non-verbally, by "point[ing] to what they wanted," and the "only words" that they spoke "clearly" were "the 'N' word and the 'B' word." D.L. also needed glasses because her "right eye was not centered and it was in the corner toward her nose." The Family Evaluation also explains that the four children, while in the care of T.T., had "untreated medical and physical conditions" and "the[ir] home environment was chaotic and unsafe." And T.T. was "regularly" under the influence of "several . . . highly addictive substances while parenting the[] children."

Moreover, Gladney's testimony, the Court Report, and the Family Evaluation indicate that T.T. was unemployed, had no "verifiable income," and was unable to provide "a safe or stable home" for the four children. Gladney opined that T.T. had never "supported the[] children" and was not currently "in a position . . . to provide [for] or support . . . the[] children." *See In re J.J.G.*, No. 14-15-00094-CV, 2015 WL 3524371, at *7 (Tex. App.—Houston [14th Dist.] June 4, 2015, no pet.) (mem. op.) (when determining "[p]arenting [a]bilities," considering "past performance as a parent," "drug use, lack of stable employment, and failure to comply with court-ordered services").

Although T.T. testified that she was "diligent" in obtaining "doctor's visits" for the four children and "in getting [them] to school," the Court Report states that the reading levels of B.J., Jr. and B.J. at the time they came into DFPS's care was "below their age group"; B.J., Jr. had been absent from school for thirty days; B.J.

32

had been absent from school for twenty-seven days; and because of their "lack of school attendance," the school was unable to "provide a grade" for the children. Further, since entering into DFPS's care, B.J., Jr. and B.J. have received medication for ADHD, ODD, and bedwetting. And D.L. and D.B.L. have received "minor surgery," glasses, and speech and play therapy.

In regard to the programs available to assist T.T., the Court Report states that T.T. "completed her psychiatric evaluation"; "completed outpatient substance abuse treatment, parenting classes, and anger management classes"; "started to attend a 12-step program"; and "participat[ed] in individual therapy." However, Gladney noted that T.T. did not "perform all of her services" as required by her family service plan. And the evidence presented at trial reveals that T.T. repeatedly tested positive for narcotics use throughout the pendency of the case. *See In re T.L.S.*, 2012 WL 6213515, at *7 (considering whether parent completed all required services under family service plan); *see also In re A.M.*, 385 S.W.3d at 83 ("Evidence of a recent improvement does not absolve a parent of a history of irresponsible choices.").

In regard to the stability of T.T.'s home and her plans for the children, Gladney testified that T.T. failed to "establish legal employment" and did not provide "a lease agreement for where she's living." According to Gladney, T.T. had not "provided a safe or stable home . . . for the[] children," did not demonstrate that she could "provide a safe and stable home," did not "support[]" the four children,

and was not currently "in a position . . . to provide [for] or support" them. And, as previously noted, the trial court admitted into evidence extensive details of T.T.'s criminal history and history of narcotics use.

Further, the Family Evaluation reveals that T.T. had "a long history of substance abuse," "life instability," and "dysfunctional behavior as an adult" and the children's "home environment was chaotic and unsafe." T.T. also admitted to using marijuana in February 2015 and that she had failed to provide "a paycheck stub to CPS" or a copy of a lease agreement to DFPS. *See In re A.M.*, 385 S.W.3d at 83 ("The need for permanence is a paramount consideration . . . .").

In regard to the current placements of the four children, Gladney testified that they were in two separate foster homes, with B.J., Jr. and B.J. "placed together" and D.L. and D.B.L. "placed together." The foster home in which B.J., Jr. and B.J. were placed had the potential for adoption, while D.L. and D.B.L.'s paternal grandmother was "willing to take" them. *See Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 87 (Tex. App.—Dallas 1995, no writ) ("The goal of establishing a stable, permanent home for a child is a compelling interest . . . ."). Further, according to Gladney, the children's respective placements were meeting all of their physical and emotional needs. And they were "doing pretty good" in their placements. The four children had "improved dramatically" in regard to schooling, and they were reading at a higher level. *See In re T.A.S.*, No. 05-15-

34

01101-CV, 2016 WL 279385, at \*6 (Tex. App.—Dallas Jan. 22, 2016, no pet.) (mem. op.) (considering children's improvement in foster care and noting they had "stabilized and [were] functioning well in . . . foster home").

In regard to acts or omissions that may indicate that the parent-child relationship is not proper, a parent's use of narcotics, inability to provide a stable home, and failure to comply with her family service plan support a finding that termination of her parental rights is in the best interest of her children. *In re S.B.*, 207 S.W.3d at 887–88. As discussed above, there is ample evidence that T.T. did use, and continued to use during the pendency of this case, narcotics, is unable to provide a stable and permanent home for the children, and has failed to comply with her family service plan.

T.T. asserts that the evidence in the record establishes that she "has been doing a good job at working on her issues" and her "weekly" urinalyses show that she was not "using drugs." There is evidence in the record indicating that T.T. "completed her psychiatric evaluation"; "completed outpatient substance abuse treatment, parenting classes, and anger management classes"; "started to attend a 12-step program"; and "participat[ed] in individual therapy." And there is evidence that T.T. tested negative for narcotics use "[o]n some" urinalyses. However, there is also ample evidence in the record that she repeatedly tested positive for narcotics use on numerous occasions during the pendency of this case, including less than one month

before trial, failed to successfully complete her family service plan, and is unable to provide a stable and permanent home for the children. *Cf. In re J.F.C.*, 96 S.W.3d at 268–72.

Further, evidence of improved conduct, especially over a short duration, does not conclusively negate the probative value of a long history of narcotics use and inappropriate choices. *See In re J.O.A.*, 283 S.W.3d at 346; *see also In re J.F.C.*, 96 S.W.3d at 272 (termination of parental rights in child's best interest despite evidence "mother found work," "parents' landlord . . . testified that their home was a 'safe environment,'" and "parents made attempts to comply with some parts of the trial court's order").

Viewing the evidence in the light most favorable to the trial court's finding, we conclude that the trial court could have formed a firm belief or conviction that termination of T.T.'s parental rights was in the best interest of the four children. And, viewing the evidence in a neutral light, we conclude that a reasonable fact finder could have formed a firm belief or conviction that termination of T.T.'s parental rights was in the best interest of the four children. We further conclude that the trial court could have reconciled any disputed evidence in favor of finding that termination of T.T.'s parental rights was in the children's best interest or was not so significant that a fact finder could not have reasonably formed a firm belief or conviction that termination was in the best interest of the four children.

Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's finding that termination of T.T.'s parental rights was in the best interest of the four children.

We overrule T.T.'s third issue.

## Conclusion

We affirm the judgment of the trial court.

Terry Jennings
Justice

Panel consists of Justices Jennings, Massengale, and Huddle.